IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RONALD SHANE BLAIR, JR., et al.,

    Plaintiffs,

       v.

ATLANTA GASTROENTEROLOGY
ASSOCIATES, LLC,

    Defendant.

CIVIL ACTION FILE
NO. 1:05-CV-2811-TWT

OPINION AND ORDER

    This is an employment discrimination action.  It is before the Court on the
Defendant's Motion for Summary Judgment [Doc. 50].  For the reasons set forth
below, the Defendant's motion is GRANTED.

I. BACKGROUND

    This case arises out of separate decisions by Defendant Atlanta
Gastroenterology Associates, LLC ("AGA") to fire three of its African-American
employees–Ronald Shane Blair, Jr., Mary J. Reese, and Litisha R. Johnson.  AGA is
the largest gastroenterology practice in the Southeast.  At the head of AGA is its
practice manager, Dr. Steven Morris, followed in command by its practice

administrator, Jere Pittner, and its operations manager, Suzanne Robinson.[1]  The Plaintiffs were all employees at AGA's St. Joseph's Hospital location in Atlanta.

The parties agree about very little regarding the events that led up to the Plaintiffs' firings.  What becomes evident from all their accounts is that during the relevant time period the St. Joseph's office experienced a significant degree of tension between the office's employees and AGA's management.  According to Robinson, this was partly due to the fact that AGA's former office manager, Robin Schmidt-Friends, had created an "'us-against-them' attitude, pitting the St. Joe's office against upper management and thereby hindering the implementation of practice-wide initiatives."  (Robinson Aff., ¶ 3.)  Friends, who was terminated in August 2004, claims that she was fired in retaliation for opposing unlawful employment practices at AGA.  Specifically, she has alleged that several members of AGA management instructed her to fire black employees based on their race.[2]

---

[1]Robinson began working for AGA as its operations manager in June 2004 and was employed in this position when all three Plaintiffs were terminated.

[2]Friends filed a discrimination claim with the EEOC on August 16, 2004.  The EEOC investigated this claim and determined that AGA had terminated Friends in retaliation for opposing unlawful employment practices in violation of Title VII, resulting in the filing of a separate lawsuit also currently before this Court.  See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC, 2007 WL 602212 (N.D. Ga. Feb. 15, 2007) (denying the Defendant's motion for summary judgment).

Following Friends's termination, Karen Poe was hired to fill the position of office manager at the St. Joseph's office. It was Poe who was running the office at the time each of the Plaintiffs was fired. Based on allegations of discrimination and retaliation, the Plaintiffs filed this section 1981 lawsuit on October 31, 2005. The Defendant has now moved for summary judgment. Below, the Court briefly recounts the circumstances surrounding the employment and termination of each of these individuals.

A. Ronald Shane Blair

Ronald Shane Blair began working for the St. Joseph's office on November 7, 2002, as a medical records clerk. Over the course of his employment he received several promotions and corresponding pay increases until he ultimately reached the position of Team Leader at the St. Joseph's office. Despite this success moving up the ranks at AGA, Blair claims he was also subjected to several discriminatory comments from AGA management during his tenure there. First, after a female employee accused Blair of sexual harassment in April 2003,[3] AGA's former operations manager, Susie Gill, allegedly pulled him aside and told him "you know, you can't go around touching white girls." (Blair Dep. at 48.) Also in response to

_____

[3]Blair did not receive any direct adverse employment action as a result of this complaint.

these sexual harassment allegations, another management employee, Karen Cheponis, allegedly informed Blair, "you're a black guy and you're surrounded by a bunch of women, what do you think?"  (Id. at 185.)

Blair claims that he also heard several race-based comments made by AGA doctors in reference to other African-Americans at the St. Joseph's office.  He overheard one doctor talking to Friends about an African-American female with braids and asking, "what's going on with her hair...the braids, the ethnic thing, we can't have that, it doesn't look appealing."  (Id. at 182.)  Blair further witnessed a doctor telling two African-American employees that "their blouses fit really well on black girls but white women wouldn't fit well into that."  (Id. at 183.)

Based on these comments, Blair filed an internal complaint of race discrimination with AGA and then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  AGA subsequently entered into a negotiated settlement agreement with Blair and the EEOC that was executed by Blair and AGA in December 2004.  This settlement provided that Blair would not initiate a lawsuit in exchange for AGA's agreement (1) not to harass, intimidate, dismiss, retaliate against or penalize Blair in any future matters related to his employment, (2) that all current terms and conditions of his employment would be maintained and conducted in a non-discriminatory manner, and (3) to eliminate all

documents related to Blair's EEOC filing from his employment record.  (Blair's Dep., Ex. 31.)

At the end of 2004 and the beginning of 2005, the Defendant noted a series of altercations involving Blair and other AGA personnel or patients.  In a January 28, 2005 letter to the executive committee, AGA's doctors cited several incidents demonstrating Blair's bad behavior and poor performance, including the following: (1) he acted belligerently towards a nurse and a nurse manager and later struck the back of the nurse's chair and made loud demanding comments to her; (2) he presented an AGA disciplinary action form on an employee, which he admitted had been written by his wife in violation of AGA's employee privacy rights policy; (3) he shouted at another nurse in a rude, "barking" tone and banged his hand on the counter in front of her; (4) he informed an employee that he was sure that the employee could bring his children to work, despite AGA rules and procedures prohibiting this; (5) he made only a "feeble attempt" to assist a patient with her insurance problem and never gave her a follow-up phone call; (6) he was offensive toward another patient and yelled at her during a telephone conversation; and (7) after a patient attempted to ask Blair a question regarding a procedure, Blair threw up his hands and walked away.  (Poe Dep., Ex.1.)  AGA claims that it was because of these incidents that it ultimately decided to fire him on February 3, 2005.

B. <u>Mary Reese</u>

Reese was originally hired by the St. Joseph's office as a triage nurse on June 4, 2004. In this role, she was responsible for directing patients' calls about their prescriptions and handling prescription refill requests.  In November 2004, she became the medical assistant to Dr. Richard Friedman.  Poe stated that Reese was first disciplined for problems with her job performance on November 22, 2004, just a few weeks after she began working for Dr. Friedman.  Specifically, Reese received a verbal warning and write-up from Poe for leaving approximately 65 messages on her voicemail.

Dr. Friedman states that, over the course of the two months Reese worked as his medical assistant, he experienced repeated difficulties with her because she failed to return patient phone calls and failed to provide follow-up information to patients when they requested it.  Moreover, Dr. Friedman stated that on multiple occasions, Reese told him she had returned a phone call to a patient or had given test results to a patient, and he later discovered that this was not true.  Several patients also complained that Reese had been rude to them, and Poe testified as to a time when she witnessed Reese being rude to Dr. Friedman.

Dr. Friedman eventually told Poe that he could no longer have Reese working for him because of these problems, and Poe relayed the information regarding Reese's

problems to AGA's operations manager, Robinson.  After reviewing this information, Robinson determined that Reese's employment should be terminated and instructed Poe accordingly.  Reese was fired on January 17, 2005, for failing to perform her job duties and ineffectiveness in managing her work.  (Reese Dep., Ex. 7.)

C. <u>Litisha Johnson</u>

Johnson began working for the St. Joseph's office as a procedure scheduler on November 5, 2002.  After working briefly as a triage nurse in late 2004, she voluntarily returned to the procedure scheduler position around March 2005. According to Poe, on May 11, 2005, she approached Johnson's desk in the scheduling area and found Johnson reading the classifieds section of the newspaper.  Poe asked her if she was looking for another job, and Johnson responded that she was, but then quickly folded up the newspaper and put it away.  Because she found this conduct inappropriate, Poe contacted Robinson, who then relayed this incident to Pittner. Pittner told Robinson that Johnson should be let go because she was unlikely to be a committed, productive AGA employee if she was unhappy enough to seek other employment and was brazen enough to do so on AGA time.  Johnson's employment was terminated the following day.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

Section 1981 prohibits racial discrimination in the making and enforcement of private contracts. 42 U.S.C. § 1981. Because claims brought under section 1981 and Title VII of the 1964 Civil Rights Act[4] are analyzed under the same framework, these statutes have the same requirements of proof. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998). A plaintiff can establish a prima facie case of disparate treatment under Title VII with direct or statistical evidence, or she may use

---

[4]42 U.S.C. § 2000e-1 *et seq*.

circumstantial evidence to satisfy a variation of the four-part test outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  Here, the Plaintiffs have not produced any direct evidence indicating that the personnel decisions in their individual cases were motivated by race.[5]  They also concede that they cannot show a racially hostile working environment.

To establish a prima facie case of disparate treatment based on circumstantial evidence, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside the protected class or suffered from disparate treatment because of membership in that class.  Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).  A plaintiff's burden of proving a prima facie case is light, but summary judgment for the employer is appropriate if the plaintiff fails to satisfy any of these elements.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 (11th Cir. 2003); see

---

[5]Even if the Plaintiffs did contend that they had direct evidence of discrimination, the Court does not find that any such evidence exists.  The Eleventh Circuit has clarified that where an employer "makes a specific comment in relation to a specific job or promotion, we believe that the value of that comment as direct evidence is limited to a challenge to that specific job or employment decision." Burrell v. Board of Tr. of Ga. Military Coll., 125 F.3d 1390, 1394 n.7 (11th Cir. 1997).  None of the Plaintiffs have provided evidence of a specific, racially discriminatory comment regarding their termination.

also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.").

A plaintiff's prima facie case raises a presumption of illegal discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  The burden then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment decision.  See McDonnell Douglas Corp., 411 U.S. at 802; Kelliher, 313 F.3d at 1275.  This intermediate burden is "exceedingly light."  Holifield, 115 F.3d at 1564.  After the employer articulates such a reason, the plaintiff has the opportunity to demonstrate that this reason is merely a pretext for discrimination.  Such pretext may be demonstrated either through additional evidence showing "the employer's proffered explanation is unworthy of credence," Burdine, 450 U.S. at 256, or by relying only on the evidence that comprised the prima facie case.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993). In reviewing the defendant's explanation, however, the Court cannot usurp an employer's legitimate business judgment in the absence of evidence of discrimination.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) (stating that "in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might

not be enough in a court of law").  Indeed, once a defendant proffers a non-discriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  Chapman, 229 F.3d at 1037.  In other words, the plaintiff must be able to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Each of the Plaintiffs meets the first three elements of a prima facie case.  AGA does not dispute that they were all members of a protected class, were qualified for the position they held, and suffered an adverse employment action.  The difficulty for all the Plaintiffs comes, however, in meeting the final element–demonstrating that they were replaced by or treated differently than someone outside their protected class.  Blair concedes that he cannot make such a showing.  He argues rather that this Court should follow the Second Circuit in providing an alternative fourth prong where a plaintiff can show that "his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class."  Chambers

v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). Reese and Johnson claim initially that they can prove they were treated differently than similarly situated individuals outside of their protected class, but also make the argument that they, like Blair, were fired under circumstances raising an inference of discrimination. The Court will separately address each of these potential means of satisfying the prima facie requirement.

To meet her burden of establishing this traditional fourth prong, a plaintiff must show that the she and another employee are similarly situated "in all relevant respects." Knight v. Baptist Hospital of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (quotation marks omitted). In making this determination, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. The Eleventh Circuit thus requires that the "quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).

Reese makes two attempts to demonstrate disparate treatment compared to someone similarly situated to her in every respect except race. First, she points to the Defendant's admission that she was replaced by a white female. Reese's replacement,

however, was a Licensed Practical Nurse who possessed superior qualifications. Therefore, they are not similarly situated.  Reese also identifies a Latino nurse, Debbie Vasquez, and a Caucasian nurse, Patty Parnell, who worked for Dr. Friedman prior to her and were deemed ineffective, but were allegedly allowed to transfer to another position at AGA rather then being terminated.  The record demonstrates, however, that Vasquez was in fact terminated rather than transferred.  (Poe Dep. at 69.)

The Court also finds that the Plaintiff has failed to show that she and Parnell were similarly situated.  Reese has provided no evidence indicating that Parnell was counseled as many times or to the same extent that she was regarding her failure properly to perform her job duties.  Parnell had worked for Dr. Friedman for twelve years prior to joining AGA's St. Joseph's office.  He had not received any complaints about her performance prior to his move to AGA.  According to Dr. Friedman, Parnell was accustomed to a small practice and did not adjust well to the larger size of the St. Joseph's office.  (Id. at 12; Barry Dep. at 32.)  He stated that the telephone system was sometimes difficult for her and that the volume of patients was more than she was accustomed to.  (Friedman Dep. at 14.)  Parnell was thus allowed to transfer to AGA's smaller Woodstock office.

In contrast to this relatively minimal list of problems with Parnell over a period covering more than a decade, Dr. Friedman stated that over the approximately two

months that Reese was working for him: (1) Reese told him she had returned phone calls to patients and given them test results when she had not; (2) he received numerous complaints from patients in regards to Reese's failure to return their voicemails; (3) one patient said she was pulling her records and going to a different doctor because of problems caused by Reese; and (4) Reese signed Friedman's name to a disability document without his authorization.  (Friedman Dep. at 32-37.)  Dr. Friedman thus felt that Reese was a detriment to his practice and that he could not trust her anymore.  (<u>Id.</u> at 37.)

Poe's documentation of problems involving Reese further supports this distinction between Reese and Parnell.  On one occasion, Reese allegedly told Dr. Friedman in front of another patient that a patient of his had called him at least ten to twelve times.  This angered Dr. Friedman and he asked Poe to handle it.  (Poe Dep. at 75.)  When Poe followed up on the claim, she discovered that this particular patient had left these messages for Reese, not Dr. Friedman.  (<u>Id.</u> at 75-76; Ex. 4.)  In another instance, Poe listened in as Dr. Friedman spoke with a patient about the patient's concerns regarding his medication. According to the patient, he had relayed his concerns to Reese, but she had failed to inform Dr. Friedman, telling him instead that the patient was fine.  (<u>Id.</u> at 78-79.)

Reese has done nothing to refute Dr. Friedman and Poe's testimony regarding these documented instances of ineffectiveness, other than to claim that she had heard no complaints and felt she was doing an excellent job.[6]  (Reese Dep. at 59, 67, 76, 81, 86.)   Her self-serving self-assessment is insufficient to combat the Defendant's evidence, however.  See Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about [her] ability ... are insufficient to contradict an employer's negative assessment of that ability.").  She does admit, moreover, that she had been informed of her failure to monitor properly her phone messages and had been relieved of the duty to call patients by Dr. Friedman shortly after he confronted her.  (Reese Dep. at 68-71, 75.)  Based on this evidence, the Court concludes that Reese has failed to demonstrate that she was similarly situated with Parnell and thus cannot meet this traditional fourth element of a prima facie case.

Johnson also contends that she was replaced by a white employee.  She provides no evidence to show this, however, other than her own statement that this employee, "Rachel," was sitting at Johnson's desk and answered the phone when

---

[6]Friends's statement that Reese was an "excellent employee" does not change this analysis.  Friends's employment with AGA ended on August 13, 2004.  Reese did not begin working for Dr. Friedman until November 2004.  Friends thus could have no knowledge of how Reese performed for Dr. Friedman.

Johnson called her desk line shortly after being terminated.  (Johnson Dep. at 77-78.)

Poe has testified that Johnson was not replaced at all.  (Poe Dep. at 111-12.)  Indeed,

Johnson confirmed that Rachel worked at AGA prior to her termination and does not

explain why she believes this individual replaced her.  The Court thus does not find

that Johnson has demonstrated a triable issue on this claim.

Johnson also asserts that she was treated differently than similarly situated

white employees.  According to Johnson, one white nurse, Amy, was allegedly

allowed to "sit[] at her desk eating in front of patients, on the internet, looking at her

baby, talking on her cell phone."  (Johnson Dep. at 25.)  Johnson also contends that

when blacks came in late to work, "something was said," whereas when whites came

in late, nothing was said.  (Id. at 29.)  To meet the "similarly situated" requirement,

however, Johnson must be able to show that she and these employees engaged in

"nearly identical" conduct but were disciplined in different ways.  See Daniel v.

Spectrum Stores, Inc., 381 F. Supp. 2d 1368, 1376-77 (M.D. Ga. 2005) (finding that

the plaintiff cashier, who had failed to work a scheduled shift, was not similarly

situated with another employee who had objected to the shift and had it changed)

(citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1186 (11th Cir.

1984)).  The Plaintiff's generalized and unsubstantiated allegations do not fulfill this

requirement.  Johnson has presented no evidence that any other employee informed

her supervisor that she was looking for another job on AGA company time and was not fired.  Her claim is without merit.

The Plaintiffs also attempt to make their prima facie case by claiming that they were fired under circumstances giving rise to an inference of discrimination.  See Chambers, 43 F.3d at 37.  The Eleventh Circuit, however, has held that evidence of comments suggesting discriminatory animus can sustain a prima facie case only where a plaintiff demonstrates that the comments were in some way associated with the decision to fire her. Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1322-23 (11th Cir. 1998).  Other circuits are in accord.  See Asmo v. Keane, Inc., 471 F.3d 588, 595 (6th Cir. 2006) ("In discrimination cases, in order to evaluate the relevance of a remark made by an individual who works for the employer...we consider both the substance of a remark as well as the influence the individual had in the employee's termination."); Hunt v. City of Markham, Ill., 219 F.3d 649, 652 (7th Cir. 2000) ("[T]he fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the decision had a discriminatory motivation.").  The Court thus finds that in order to establish a prima facie case based on racially discriminatory statements, a claimant must be able to show that such statements had a direct impact on the employer's ultimate decision to terminate her employment.

Here, the Plaintiffs provide the following evidence of discriminatory animus. First, as discussed previously, Blair described several racially discriminatory remarks made by various members of AGA management.  Friends also provided evidence of discrimination at the St. Joseph's office during her tenure as office manager.  She testified that she heard several comments she considered to be racially discriminatory being made about Blair by AGA management.  After sexual harassment charges were filed against Blair, Gill told Friends "Shane is a black man.  He can't go around feeling up white women in this office."  (Friends Aff., ¶ 11.)  On another occasion when money was discovered missing while Blair was a financial counselor, Gill suggested that Blair had stolen it, telling Friends "Shane is behind on his child support, and that's probably why the money is missing...black people don't pay their child support."  (Id., ¶ 12.)  Gill's replacement, Suzanne Robinson, also allegedly told Friends to fire Blair on several occasions because she had "heard all about him."  (Id., ¶ 13.)  Friends further witnessed racially discriminatory comments made about other African-American employees at the St. Joseph's office.  Gill described one black female employee as "looking like Aunt Jemima" and stated that another was "too lazy to run a comb through (her hair), it's a black thing."  (Id., ¶ 15.)

Finally, Friends described a series of comments indicating discrimination in AGA's hiring practices.  Pittner, AGA's practice administrator, allegedly told Friends

to fire a black employee because of her race, but to "be creative" to avoid legal problems. (Id., ¶ 16.) One of St. Joseph's office's doctors, Bruce Salzberg, also instructed Friends to fire a black employee, referring to this employee as "black and annoying" and telling her to "fire her black face." (Id., ¶ 21.) Dr. Salzberg further suggested to Friends that AGA should put white employees in the front to improve St. Joseph's office image and increase business. (Id., ¶ 17.) According to Friends, Gill agreed with Dr. Salzberg's comments, instructing Friends to "start interviewing-the doctors want white people Robin, professional image white people at the front desk. We are too top heavy with Blacks – you need to fix this." (Id., ¶ 18.) Gill also told her to talk to recruiters about finding a "cute white girl" and to offer $2.00 more per hour if necessary. (Id., ¶ 19.) When Friends reported the substance of these conversations to AGA's Human Resources Director, Judy Barry, Barry laughed and told her "well, if the doctors want it, just do it,...just be careful," and "keep it low-key." (Id., ¶ 20.)

By this evidence, the Plaintiffs have thus demonstrated that management level employees at AGA made discriminatory comments and indicated an intent to get rid of black employees because of their race. The Court must apply these comments to each Plaintiff's claims to determine whether these statements had a direct impact on AGA's ultimate decision to fire each of them.

Blair has provided evidence of several discriminatory statements made against him or against blacks in general by Gill, Cheponis, Pittner, and Salzberg.  Gill and Cheponis's statements, standing alone, do little to establish a prima facie case because Cheponis was not Blair's supervisor and Gill was no longer St. Joseph's office's operations manager by the time Blair was fired.  The statements that Friends attributes to Pittner and Salzberg are more significant, however, because of their potential effect on Blair's termination.  Salzberg, who allegedly told Friends to "fire her black face" in reference to another African-American employee, was one of the doctors who signed the document recommending Blair's termination. (Poe Dep., Ex. 1.)  Pittner, who was second in command at AGA, allegedly ordered Friends to fire another employee because she was African-American.  According to Poe, Pittner would need to be consulted before any employment decision was made.  (Poe Dep. at 44.)

These comments are only relevant, however, to the extent that they indicate some racial animus that may have caused Salzberg and Pittner to seek Blair's termination in 2005.  Notably, no evidence exists that either of these statements was proximate in time to his termination.  Indeed, Friends left AGA in August 2004, almost five months before the decision to fire any of these Plaintiffs was made.  Moreover, Salzberg was one of nine doctors who signed the petition recommending Blair's termination.  See Cerutti v. BASF Corp., 349 F.3d 1055, 1066-67 (7th Cir.

2003) (requiring that, where an employment decision is made by multiple decision makers, the plaintiffs present evidence from which a reasonable jury could infer that the prejudicial views of some "influenced their fellow panel members to such a degree that it resulted in their being terminated").  Salzberg also stated that it was Poe who brought these incidents involving Blair to his attention and that it was "definitely" her decision to fire him.  (Salzberg Dep. at 12-16.)[7]  There is absolutely no evidence that Poe ever exhibited discriminatory animus towards anyone.  To the contrary, Blair himself testified that he did not believe he had been discriminated against by her.  He claimed rather that there was a "power struggle" between them, and that Poe wanted to fire him because he was a professional threat to her.  (Blair Dep. at 160-61.)  Blair also provides no evidence that Pittner ever discriminated against him or expressed animus towards him because he was black.

The only other notable evidence is Friends's statement that Robinson told her to fire Blair because she had "heard all about him."  (Friends Aff., ¶ 13.)  He fails to demonstrate, however, that Robinson ever made any discriminatory statement or exhibited discriminatory animus towards him or any other employee.  The Court thus

---

[7]Poe testified, however, that the office manager did not have the authority to make employment decisions and that the decision came from upper management, which included Robinson and Pittner.  (Poe Dep. at 56.)

finds that, even viewing all evidence in the light most favorable to the Plaintiff, these statements fail to create an inference that Blair was fired because of his race.

Evidence of discriminatory statements made towards Reese and Johnson is non-existent.[8]   Reese and Johnson rely exclusively on the testimony of Friends to demonstrate their prima facie cases.  There is no indication that Dr. Salzberg played any role in their terminations, however.  The totality of their discrimination claims rests entirely on one comment attributed to Pittner, that at some point prior to Friends's termination Pittner allegedly told her to fire someone because she was African-American.  The Court finds that this isolated statement made well before their firings is insufficient to make a prima facie showing.  The Defendant's motion for summary judgment on these claims is thus warranted.

Even assuming that Blair could make out a prima facie case, the Court further finds that the Defendant has shown legitimate, non-discriminatory reasons for terminating him.  AGA's management documented a number of problems with Blair towards the end of his employment indicating a pattern of disrespectful and disruptive

---

[8] Johnson stated in her interrogatory only that, sometime in 2002 or 2003, she heard Gill state that "it's too dark at the front desk."  (Johnson Dep. at 75.)  Again, however, this comment was not made about her and because Gill was no longer working at St. Joseph's office at the time Johnson was terminated, this evidence does not relate to the decision to fire her.

behavior.   Specifically, in a January 28, 2005 letter from AGA's doctors to the

Executive Committee, the doctors provided the following:

> Ronald Shane Blair currently holds the position of Team Leader at the
> St. Joseph's Office.   Recently, it has come to the attention of the
> physicians that there have been a number of incidents involving both
> patients and staff that are of concern.   After reviewing each of the
> incidents we have outlined below, it is our consensus that Ronald Shane
> Blair should be discharged from the practice.  We believe that his further
> employment could jeopardize the progress we are making in our staff
> development and patient growth.

> Incident Number One:
> Recently, Shane Blair used a belligerent approach when discussing a
> virtual colonoscopy case with Linda Hicks, Clinical Nurse Manager and
> Susie Dixon, nurse for Doctors Brandenburg and Kramer.  Not only did
> Mr. Blair strike the back of the chair in which Susie Dixon was sitting
> while she was on the telephone with a patient, but he argued with them
> insisting that virtual colonoscopies are performed in the St. Joseph's
> Office.  When he realized he was not clinically correct, he made a loud,
> demanding comment to Susie Dixon.  Ms. Dixon has expressed to Dr.
> Kramer that she is afraid of Mr. Blair.

> Incident Number Two:
> Shane Blair presented two documents on employee, Mazelle Leslie.  One
> document, dated 12/22/2004 was written and signed in Mr. Blair's
> handwriting on a yellow ruled sheet of paper.  The other document, an
> AGA disciplinary action form also dated 12/22/2004, was written in
> handwriting other than Mr. Blair's own handwriting, but was signed in
> his handwriting.  Upon asking why a difference in handwriting was
> present, Shane indicated that his wife had written the form for him at
> their home because he had bad handwriting.  Also indicated was the fact
> that he was thinking about Mazelle and talking to his wife about the
> situation.
> In a formal disciplinary discussion complete with a signed disciplinary
> action statement, Karen Poe, along with Dr. Bruce Salzberg as a witness,
> spoke with Mr. Blair about this situation.  Explanation was given to

Shane that if these documents had been presented to Ms. Leslie she would have been entitled to a copy of these documents and could have questioned the fact that two different handwritings were evident. His actions could have resulted in litigation against AGA by Ms. Leslie.

Incident Number Three:
The new registered nurse for Doctors Eisenbrand and Friedman, Ann Simica B.S.N., M.S.N., was employed for three days when Shane Blair shouted at Ms. Simica in a very rude, "barking" tone. He banged his hand on the counter while he was shouting. Later the same day, Mr. Blair took Ms. Simica into the physicians' dictation room. When Ms. Simica came from the room she was visibly shaken. Ms. Simica was so upset by Shane's actions that she talked to Dr. Friedman regarding the incident.

Incident Number Four:
Mr. Blair informed an employee he could bring his children to work when the employee was experiencing a childcare quandary. The employee asked Mr. Blair if he was certain this was acceptable. Mr. Blair affirmed this action was allowed.

Incident Number Five:
A patient of Dr. Salzberg told our office manager that she spoke with Shane regarding an insurance problem. She felt he made a "feeble attempt" to assist her and he never gave her a follow-up phone call. The patient told the office manager she wanted her medical records so she could find another physician.

Incident Number Six:
A patient expressed to Dr. Friedman that Mr. Blair was very offensive to her in a telephone conversation. He even yelled at the patient.

Incident Number Seven:
Dr. Salzberg's patient attempted to ask a question of Shane regarding a procedure. Shane threw up his hands, walked away from the patient and indicated he could not deal with the patient. The office manager was called to assist the patient. This illustrates Shane Blair's inability to communicate effectively with patients.

(Poe Dep., Ex. 1.)  Blair's rude and disruptive behavior is confirmed by another AGA employee, Abby Veal, who testified regarding Blair's interaction with Leslie.  She reported that he acted unprofessionally by yelling at Leslie in front of the entire office. (Veal Dep. at 32-33.)  Poe also testified regarding Blair's interaction with Leslie later in her office and confirmed that he was "out of control" and "yelling at the top of [his] lungs."  (Poe Dep. at 40-41.)

The Court acknowledges that this evidence against Blair is not overwhelming. None of these incidents, with the exception of Blair's formal reprimand for attempting to write-up Leslie, include a relevant date.  Nor has the Defendant produced a witness to confirm some of the incidents alleged in the letter.  Yet it is not the Court's place to sit as a "super-personnel department," reexamining AGA's business decisions. Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.1988)).  "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers... our inquiry is limited to whether the employer gave an honest explanation of its behavior."  Id.  AGA's documentation of several incidents of disruptive behavior by Blair over a short period of time constitute a reasonable and honest explanation for its decision to fire him.  The Court thus finds

that the Defendant has met its burden of providing a legitimate, non-discriminatory reason for Blair's termination.

Accordingly, the Plaintiff must demonstrate that these reasons are pretext for discrimination.  As explained by the Eleventh Circuit, the Plaintiff bears the burden of offering "enough probative evidence so that a reasonable jury might conclude that [the Defendant's] reasons for termination were a pretext." Damon v. Fleming Supermarkets Of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).  The Plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Alabama State Tenure Com'n, 405 F.3d 1276, 1289 (11th Cir. 2005).  Here, Blair does not dispute any of the Defendant's stated reasons.  He argues merely that proof of a "discriminatory atmosphere" in the St. Joseph's office indicates that these proffered reasons for firing him were pretext. See, e.g., Asmo, 471 F.3d at 595 ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff."); Antol v. Perry, 82 F.3d 1291, 1302 (3d Cir. 1996) (stating that evidence of a hostile atmosphere can be used by factfinder to determine pretext); Perdomo v. Browner, 67 F.3d 140, 146 (7th Cir. 1995) (holding that a trier of fact may infer discrimination

from evidence that an EPA supervisor dined only with his Caucasian section chiefs and assigned all the Hispanic attorneys to the section with the Hispanic chief).  The Eleventh Circuit, moreover, while never using the discrete term, "discriminatory atmosphere," has discussed the evidentiary value of an employer's past discriminatory statements in demonstrating pretext.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (concluding that an employer's statement that "women aren't typically in that type of position" could allow a reasonable factfinder to infer discriminatory animus); Horne v. Turner Const. Co., 136 Fed. Appx. 289, 293 (11th Cir. 2005) ("Turner employees...testified that women should not do strenuous work and that women are better suited for cleaning work. Evidence of their attitudes is probative of pretext..."); Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (allowing evidence of racial slurs to demonstrate pretext).

Although evidence of a discriminatory atmosphere may indicate that the employer's proffered reasons are pretext, the Court finds that this alone is insufficient to carry a plaintiff's burden.  Indeed, in Wilson, 376 F.3d at 1079, it was not discriminatory animus alone that permitted the plaintiff to avoid summary judgment. The Eleventh Circuit noted evidence of a supervisor's admission that the plaintiff was the "most qualified" and "the obvious choice," accompanied by some evidence of discriminatory animus, was sufficient to allow a reasonable factfinder to conclude that

the supervisor did not think the male candidate was more qualified than the plaintiff.
Id. at 1091.  Here, by contrast, general discriminatory statements are the sum of the
evidence against AGA.  Unlike the plaintiff in Wilson, Blair has failed to demonstrate
a prima facie case based upon evidence that a similarly situated employee had been
treated differently.  His proffered prima facie evidence, accordingly, is notably
weaker.  As recently stated by the Supreme Court,

> Whether judgment as a matter of law is appropriate in any particular case
> will depend on a number of factors. Those include the strength of the
> plaintiff's prima facie case, the probative value of the proof that the
> employer's explanation is false, and any other evidence that supports the
> employer's case and that properly may be considered on a motion for
> judgment as a matter of law.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-49 (2000) (emphasis
added); compare Pierce v. Netzel, 148 Fed. Appx. 47, 50 (2d Cir. 2005) (holding that
a weak prima facie case combined with a weak showing of pretext generally cannot
create a reasonable inference of intentional discrimination), with Laxton v. Gap Inc.,
333 F.3d 572, 582 (5th Cir. 2003) ("Gap's proffered justification becomes even less
credible when viewed in light of the strength of Laxton's prima facie case."). Reeves
and these circuit opinions thus make clear that all prima facie showings are not the
same.  To the contrary, discrimination lawsuits require a case-by-case approach in
which the court examines the entire record "to determine whether the plaintiff could
satisfy his 'ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff.'" <u>Cross v. New York City Transit Auth.</u>, 417 F.3d 241, 249 (2d Cir. 2005) (<u>quoting</u> <u>Reeves</u>, 530 U.S. at 143).

Here, the Plaintiff has clearly failed to provide evidence sufficient to persuade a reasonable jury. His prima facie showing is based on only the barest of evidence. He has further failed to rebut any of the facts constituting the Defendant's proffered reason for firing him and offers no new evidence to make a showing of pretext. Indeed, he even testified that he believed his firing was more of a power struggle between him and Poe than it was a "racial thing." (Blair Dep. at 160-61.) His only other attempt to show pretext is to argue that, after working at AGA for over two years and receiving consistent promotions and pay raises without any complaints, it is suspicious that he suddenly became an abusive and ineffective employee in the last months of his employment. He claims that "alleged negative performance after a sustained period of good performance can produce strong evidence of pretext." (Pls.' Resp. to Mot. for Summ. J., at 17-18.) It is true that a sudden downturn in an employer's performance reviews could raise an inference of pretext. <u>See, e.g.</u>, <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 834 (8th Cir. 2002) ("Recent favorable reviews are often used as evidence that the employer's proffered explanation for the adverse action had no basis in fact or was not actually important to the employer."); <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 331 (3d Cir. 1995) (finding

a triable issue of fact based on the contradiction between the employer's claim that the plaintiff had been fired because of continuous performance problems and the plaintiff's demonstration that he had received a bonus three months before he was fired); Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779 (8th Cir. 1995) (stating that "demonstration of competence may serve as evidence of pretext when an employee is discharged for incompetence"); see also E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 408 (4th Cir. 2005) (noting record evidence demonstrating that a plaintiff's supervisors "were pleased with her overall job performance and that her opposition to the plan to terminate Simms was the actual basis for her discharge"). However, where an employer provides legitimate reasons for more recent negative reviews, mere evidence of past good performance does not demonstrate that the employer's legitimate non-discriminatory reasons cannot be believed. See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 729 (8th Cir. 2001) (stating that "[a]n employer may choose to rely on recent performance more heavily than past performance"); Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999) (concluding that a single positive review and raise ten months prior to the adverse action does not indicate pretext in the face of evidence that the employee had a bad attitude on a number of specific instances occurring after the raise and review); see also Fasold v. Justice, 409 F.3d 178, 192 (3d Cir. 2005) ("Evidence of previous

positive performance reviews does not prevent Appellees from considering the opinions of those who have expressed a negative view of Fasold's work.")  Given the incidents of Blair's unprofessional behavior provided by the Defendant, the Court finds that Blair's claim that the timing of his firing was suspicious is insufficient to demonstrate pretext.  The Court thus concludes that, even giving every reasonable inference to the Plaintiff, Blair has failed to demonstrate a triable issue of race discrimination.  Summary judgment for the Defendant is thus warranted.

Blair has also asserted a claim of retaliation against the Defendant because he was fired after he filed a claim with the EEOC.  To prove retaliation, a plaintiff must demonstrate that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between these two events. The Defendant then has the opportunity to proffer a legitimate, non-discriminatory reason for the adverse employment action.  See E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).  The Defendant does not dispute that Blair can show the first two elements of a prima facie case, but contends that Blair has failed to show a causal connection between his EEOC filing and his termination.  Even if the Plaintiff can meet this third requirement, however, the Defendant has provided several non-discriminatory reasons for Blair's termination and Blair fails to point to any evidence indicating that these reasons were mere pretext for retaliation.  He provides only AGA

management's commentary about "being creative" and "being careful" about their allegedly discriminatory firings.  (Pls.' Resp. to Mot. for Summ. J., at 22.)  Given the Plaintiff's failure to rebut any of the Defendant's proffered reasons for terminating him, these isolated comments, which are completely unrelated to his termination in time and context, are insufficient to demonstrate a triable issue on this claim. Accordingly, summary judgment for the Defendant is appropriate.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 50] is GRANTED.

SO ORDERED, this 2 day of July, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge